IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FATIMA FORD on behalf of K.F.W., | ) | Case No. 1:16-cv-01376 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.   Introduction

Plaintiff Fatima Ford seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying an application she filed on behalf of her minor child ("KFW") for supplemental social security income ("SSI") under Title XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the Commissioner supported the decision in this case with substantial evidence and made no error in the application of law, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II. Procedural History

On February 19, 2013, Ford applied for SSI benefits on behalf of KFW. (Tr. 126-29, 142) She alleged a disability onset date of December 6, 2012. (Id.) Ford stated that KFW was disabled because of attention deficit hyperactivity disorder ("ADHD") and a learning disorder. (Tr. 70) The application was denied initially and upon reconsideration. (Tr. 70-91, 92, 96). Thereafter, Ford requested a hearing before an administrative law judge. (Tr. 99)

Administrative Law Judge Frederick Andreas ("ALJ") conducted a hearing on May 21, 2015. (Tr. 31-69) The ALJ denied the claim on June 26, 2015. (Tr. 10-30) The Appeals Council declined to review that decision on April 20, 2016, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6)

## III. Standard for Child Disability Claims

The standard for evaluating a child's disability claim differs from that used for an adult. 42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that

2

meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner must assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). This done by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations[1] in two domains, or an "extreme" limitation[2] in one domain, the impairments functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

## IV. The ALJ's Decision

The ALJ issued a decision on June 26, 2015, finding:

1. KFW has been considered a school-age child, that is a child age six to the attainment of age 12, ever since the December 6, 2012, alleged onset date. (Tr. 16)

2. KFW has never engaged in substantial gainful activity. (Tr. 16)

3. KFW has the following "severe" medical impairments: attention deficit hyperactivity disorder, an organic mental disorder, learning disorders, and behavioral problems. (Tr. 16)

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked."
Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

3

4. Since the December 6, 2012, alleged onset date, KFW has not had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 17)

5. Since the December 6, 2012, alleged onset date, KFW has not had an impairment or combination of impairments that has functionally equaled the severity of one of the listed impairments. (Tr. 17)

   In determining functional equivalence, the ALJ individually evaluated KFW's abilities under all six domains of functioning and made the following findings:

   A. Acquiring and using information: less than marked limitation
   B. Attending and completing tasks: less than marked limitation
   C. Interacting and relating with others: marked limitation
   D. Moving about and manipulating objects: no impairment
   E. Caring for yourself (Self-care): no impairment
   F. Health and physical well-being: no impairment

Based on these findings, the ALJ determined that KFW had not been under a disability at any time between the December 6, 2012, alleged onset date, and the date of the decision. (Tr. 26)

Plaintiff's sole argument is that the ALJ erred in failing to find her child suffered from a marked limitation in the domain of "Attending and Completing Tasks."

## V. Evidence

### A. Medical Evidence

Because plaintiff has raised only a single issue, I will focus the discussion of evidence on those matters that directly bear upon the issue of KFW's abilities and limitations in the domain of attending and completing tasks.

KFW saw Hasan Assaf, M.D for a consultative physical exam on May 10, 2013. (Tr. 237-40) Ford reported that KFW began taking Ritalin after he was diagnosed with ADHD in December 2012. (Tr. 237) She told Dr. Assaf that KFW's symptoms had "greatly improved"

4

and he was "much quieter" as a result. (Tr. 237) Dr. Assaf found no physical limitations upon examination. (Tr. 240)

David V. House, Ph.D., conducted a consultative psychological evaluation on May 13, 2013. (Tr. 243-52) Although plaintiff told the doctor that KFW had been diagnosed with ADHD and was prescribe medication, the record reveals that KFW had not taken his medication the day of the evaluation. (Tr. 245) Upon examination, Dr. House found KFW restless and fidgety but also generally cooperative, able to tolerate frustration adequately, and to respond appropriately to redirection. (Tr. 247) IQ testing yielded a full scale IQ of 84. (Tr. 248-49) Dr. House noted that the result was in the "low average or essentially average range considering the more important features, namely Verbal Comprehension and Perceptual Reasoning." (Tr. 249) Dr. House further noted that "looking at these scores would not give the sense for his difficulties maintaining attention." (Tr. 247) With regard to KFW's ability to attend to and complete tasks, Dr. House found:

> [KFW] is able to pay attention and respond to direct questions from an adult in a one on one situation. He may have some difficulties sustaining attention for prolonged periods although this condition appears less prominent under psychostimulants.
>
> The examiner has given examples of [KFW] introducing his own comments while he's supposed to be engaged in a task. He does return to task after getting responses from whoever is supervising him.
>
> With medication he seems less likely to interrupt peers with high levels of activity with distracting physical or verbal behavior or frequent movement from his desk. It appears according to the mother that the psychostimulant is working quite well.

(Tr. 250)

In May 2013, state agency consultants, Paul Tangerman, Ph.D. and Anahi Ortiz, M.D., reviewed KFW's claim filed and found that his ADHD and learning disorder were severe

impairments. (Tr. 75) Drs. Tangerman and Ortiz opined that KFW had a less than marked limitation in the domains of acquiring and using information; attending to and completing tasks; and interacting to and relating with others. (Id.) They also found that KFW did not have any limitations in the domains of moving about and manipulating objections; caring for self; and health and physical well-being. (Tr. 76) In September 2013, state agency consultants, Mel Zwissler, Ph.D., and John L. Mormol, M.D. affirmed these findings. (Tr. 86-88)

On August 23, 2013, KFW underwent a mental health assessment at Beech Brook. (Tr. 281-98) KFW's mother had requested intervention services to improve his ability to control his hyper, at risk, and impulsive behavior. (Tr. 282) It was noted that his teacher agreed with his mother's assessment. (Id.) KFW's presenting problems were listed as follows: disruptive in school, impulsive behavior, inattention/poor concentration, lying, memory impairment, overanxious, poor peer relations, and poor self-esteem. (Tr. 281) It was noted that KFW was taking 10 mgs of Ritalin in the morning and 5 mgs in the afternoon. (Tr. 290, 295)

On June 24, 2014, KFW returned to Beech Brook. (Tr. 323-37) It was noted that one of KFW's treatment goals had been to learn to sustain attention while increasing on-task behavior. (Tr. 332) It was reported that KFW had "more difficulties with self-control this period because he was not taking his meds for a lengthy period of time." (Tr. 332) It was also noted that KFW appeared to make "very inconsistent progress this period." (Tr. 333) The provider at Beech Brook stated that KFW struggled with impulsive and unfocused behavior and had an inability to control antagonistic and confrontational responses to others. (Id.) The provider further stated that KFW's behavior was:

> [R]emarkable since [he] had been known to be one of the most cooperative
> students in his [special education] class. Important to note that he did not have
> meds to suppress ADHS symptoms (intense) for several months of this reporting

6

period. Family missed at least 3 scheduled med som consultations with [Beech Brook's] Dr. Eppright. When client has Concerta dose symptoms such as defiance, anxiety, impulsivity, low frustration tolerance all significantly decrease.

(Id.)

The medical evidence also includes three treatment notes from Laura Caserta, M.D., (March 2014, November 2014, and December 2014). (Tr. 357-66) Dr. Caserta noted in all three provider notes that KFW was being treated for ADHD. (Tr. 358, 362, 364) In March 2014, Dr. Caserta recorded that KFW had run out of his medication the prior month but that he "did very well when on it." (Tr. 364) In November 2014, Dr. Caserta changed KFW's prescription to a long-acting medication and advised that he should return in one month. (Tr. 363) The next month, she recommended he continue the current dosing of his medication and follow up in 3 months, or sooner if any problems arose. (Tr. 360) There are no further treatment notes from Dr. Caserta. There is nothing in the record to indicate plaintiff took KFW back to Dr. Caserta as instructed for the three-month follow up.

### B. Educational Records

The record also contains an April 23, 2013, teacher questionnaire from KFW's third grade teacher, Roberto Perkel. (Tr. 151-58). Perkel reported that KFW's math skills were at a 1.8 grade level and he was reading at a 2nd grade level. (Tr. 151) Perkel reported "serious" to "very serious problems" in the domains of acquiring and using information; attending and completing tasks; interacting and relating to others; moving about and manipulating objects. (Tr. 152-55) Perkel opined that KFW had no problems caring for himself. (Tr. 156) It was noted that KFW took medication for ADHD. (Tr. 157) Perkel opined that KFW was "completely off task without [his meds and] able to focus a little with it." (Id.) Under the attending and completing tasks domain, Perkel added that KFW was "very dependent" and "needy." (Tr. 153)

In April and May of 2013, KFW underwent a "team evaluation" at his school after a teacher referral for concerns of anger management issues, poor concentration, lack of focus leading to academic failure, and failure to complete assignments. (Tr. 201-33). KFW was fidgety and frequently off-task when observed in the classroom. (Tr. 202-03) The assessment found that KFW's performance varied from week to week and that he was "constantly" off-task. (Tr. 209) It was determined that KFW had an educational disability in the "Other Health Impairment (Minor) category." (Tr. 212)

On March 4, 2015, Kimberly Fowler, KFW's intervention specialist, completed a teacher questionnaire. (Tr. 197-200) At that time, KFW was in a cross-categorical 5th/6th grade classroom. (Tr. 197) Ms. Fowler expressed that KFW had difficulty staying focused. (Tr. 198) She also stated that KFW struggled to ignore his peers and often got upset to the point where he could not function in class. (Tr. 199) Ms. Follower indicated that KFW was capable of rule-following but his lack of focus caused him to miss important instructions. (Id.) In a letter dated May 20, 2015, Ms. Fowler reported that KFW lacked focus and control, and that he struggled to use coping strategies to calm down. (Tr. 234)

An Individualized Education Plan ("IEP") was developed for KFW for the period March 24, 2015, through March 23, 2016. (Tr. 221-33) At that time the IEP was developed, KFW was ten years old and in the fifth grade. (Tr. 222) It was noted that he struggled focusing long enough to hear and follow directions for a specific tasks. (Id.) It was determined that KFW would take all core subjects in the resource room where he could receive small group instructions with intensive guided practice and modeling. (Tr. 230)

### C. Testimonial Evidence

#### a. KFW Testimony

KFW testified at the hearing. (Tr. 34-49) He stated he was 10 years old. (Tr. 35) KFW testified that he talked with a counselor most days at school. (Tr. 41) KFW testified that he was in Ms. Fowler's classroom for math, science, and reading. (Tr. 45) KFW further testified that some of the students in Ms. Fowler's class picked on him. (Tr. 44) He stated that his current grades consisted of two B's (reading, social studies), one A (science), one C (math), and one D (music). (Tr. 47) He reported that he was suspended from school once for three days for starting a fight with another student.[3] (Tr. 42) KFW testified that he had friends in his neighborhood and did not get into fights with them. (Tr. 43-44)

KFW testified that he "used to" take medication. (Tr. 44) KFW testified that the medication helped him stay focused "a little" but that it wore off the last two periods. (Tr. 46-47) He testified that he did not like to take his medication. (Tr. 46) When asked why, KFW talked about having problems (presumably with family) because he did not refill a water jug in the refrigerator after taking his medicine at home. (Id)

KFW informed the ALJ that he would be performing in a play in the near future with his aftercare group and that he had been cast to perform in another play in the future. (Tr. 48-49)

#### b. Ford Testimony

Ford, KFW's mother, also testified at the hearing. (Tr. 50-60) Ford testified that KFW was diagnosed with ADHD in the third grade. (Tr. 52) Ford reported that KFW saw Dr. Caserta every three months for medication refills and had last seen the doctor a few weeks prior to the

---

[3] KFW's mother later testified that he was suspended from his afterschool care program. (Tr. 55-56)

9

hearing. (Tr. 53) Ford's counsel acknowledged that there were no notes for that visit in the record. (Id.) Ford stated KFW was first prescribed 15 mgs a day of Ritalin (10 mgs in the morning, 5 mgs in the afternoon). (Id.) She stated that the medication would work when he was at school but that he had trouble during his after school program. (Tr. 53-54) Ford testified that she talked to Dr. Caserta about the problem and the doctor changed KFW's medication to an extended release formula. (Tr. 54) When asked how well the extended release formula was working for KFW, Ford responded that she did not know because he was sleeping by the time she got home from school most days. (Id.)

Upon examination by her attorney, Ford stated that KFW was "still unfocused" and noted that he had recently been suspended for three days from his afterschool program. (Tr. 55-56) She stated that he rarely completed his chores. (Tr. 56-57) She said she constantly had to remind her child to take a bath, put on his deodorant, complete his homework, and attend to other everyday tasks. (Tr. 57) She testified that KFW did not stop and think before acting and that he had to be supervised outside or he would run into the street without looking for cars. (Tr. 59) She stated that he goes to a nearby friend's house on his own and generally gets along with the neighborhood children. (Id.)

  c.  **Medical Expert**

John DiTraglia, M.D., also testified at the hearing as a Medical Expert ("ME"). (Tr. 60-68) Dr. DiTraglia testified that KFW was limited by his ADHD, as well as learning and behavioral problems. (Tr. 61) However, Dr. DiTraglia opined that KFW's impairments did not meet, medically equal, or functionally equal a Listing. (Tr. 61-62) With regard to the domains of functionality, Dr. DiTraglia opined that KFW was "less than marked" in the domains of acquiring and using information and attending and completing tasks. (Tr. 62) Dr. DiTraglia

stated that KFW's ability to attend to and complete tasks was impacted by KFW's ADHD but that he got "some benefit" from medication. (Id.) Dr. DiTraglia further opined that KFW was markedly impaired in the domain of interacting and relating to others. (Id.) He found no evidence of limitations in the other domains including: caring for himself and healthy physical well-being. (Id.)

Upon cross-examination, Dr. DiTraglia testified that he did not find KFW had a marked problem in attending and completing tasks because "if he was having a lot of problems in that regard, I would expect them to increase his ADHD medication and also…in the courtroom under tedious and aggravating questioning he seemed to be reasonable." (Tr. 63) He stated that he was basing his "less than marked" finding partially on what he heard in the courtroom. (Id.) However, Dr. DiTraglia later clarified that his opinion was unchanged by KFW's testimony in the courtroom and that he had reached the same opinion prior to KFW's testimony. (Tr. 64) He stated that he also took the teachers' responses and the Beech Brook evaluations into full consideration in making his determination. (Id.) He acknowledged that the teacher's reports indicated a marked impairment in "attending and concentration" when KFW was not taking his medication. (Tr. 65)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

    **B.**    **Substantial Evidence Supports the ALJ's Determination that KFW Was Not Markedly Limited In His Ability to Attend to And Complete Tasks**

As discussed above, a child is considered to functionally equal the disability Listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003). The ALJ found that KFW had no extreme limitations and only one marked

12

limitation (the interacting and relating with others domain).[4] (Tr. 22) Because only one marked limitation was found, KFW did not functionally equal the disability Listings. Ford argues that he had a marked limitation in the domain of attending to and completing tasks (hereinafter "concentration domain") and that the ALJ erred finding otherwise. ECF Doc. No. 12, Page ID# 441-45.

In finding that KFW did not have marked limitation in the concentration domain, the ALJ relied on four medical source opinions. (Tr. 21). The opinions are from the consultative psychological examiner, Dr. House; the state agency consultants, Drs. Tangerman and Zwissler; and the medical expert, Dr. DiTraglia. (Tr. 60-68; 71-77; 81-89; 243-525) Dr. Tangerman, Dr. Zwissler, and Dr. DiTraglia all separately determined that KFW had a less than marked limitation in the concentration domain. (Tr. 62, 75, 87). Dr. House stated that although KFW had "some difficulties sustaining attention for prolonged periods . . . [his] condition appear[ed] less prominent under psychostimulants." (Tr. 250) Thus, all four medical opinions provide support for the ALJ's determination that KFW had a "less than marked" limitation in the concentration domain.[5] There were no contrary medical opinions. Thus, the medical opinions

---

[4] Ford agrees with this part of the ALJ's decision and does not argue that the ALJ should have found "extreme" limitations in any of the six functional domains.

[5] Ford takes issue with some of Dr. DiTraglia's hearing testimony. ECF Doc. No. 12, Page ID# 444-45. She asserts that Dr. DiTraglia based his opinion, in part, on what he heard from KFW in the courtroom. Ford contends that this was improper because Dr. DiTraglia testified by telephone and did not witness KFW in person. Ford fails to provide any authority for her contention that the ME could not include observations from a claimant's courtroom testimony simply because he did not physically see the claimant. More importantly, however, Ford's contention is inaccurate. Although DiTraglia initially testified that he based his decision, in part, on KFW's reasonable responses to the ALJ's questioning, he later clarified that his opinion had not changed based on KFW's testimony and that he had reached the same conclusion prior to the hearing testimony. (Tr. 63-64) Ford also takes issue with Dr. DiTraglia's testimony related to KFW not taking his medication. She states that Dr. DiTraglia later agreed that there was no indication that KFW was not taking his medication. However, Dr. DiTraglia clarified that even with the medication adjustment and in the present KFW has problems with attending and completing tasks "but not to a marked degree." (Tr. 66) Therefore, Ford's complaints about Dr. DiTraglia's

alone provide as substantial evidence to justify the ALJ's determination. *Senter v. Sec'y of Health & Human Servs.,* 935 F.2d 271 at *3 (6th Cir. 1991) (ALJ's decision supported by substantial evidence because not one doctor opined that claimant was disabled).

Although the medical opinion evidence could alone constitute substantial evidence, the ALJ also relied on other evidence to support his determination. For instance, the ALJ found that KFW's ability to concentrate and persist at tasks was improved when taking his prescribed ADHD medication. (Tr. 21) In fact, as the ALJ pointed out, Ford reported on several occasions throughout 2013 that KFW's symptoms were improved on the medication. (Tr. 21, 166, 169, 184, 187, 237)[6] Ford acknowledges her statements that KFW was improved on medication. However, Ford argues that in two of the four statements the ALJ referred to, she also reported that KFW was "still having problems with concentration." ECF Doc. No. 12, Page ID# 444. Ford is correct that on two occasions (November and December 2013) she stated that KFW was getting better on the medication but he was still having problems with concentration. (Tr. 184, 187) However, Ford also stated that the doctor was increasing KFW's medication at that time to get to the right levels. (Id.) In fact, one year later, Dr. Caserta changed KFW's medication to an extended-release formula. (Tr. 363)

Ford also argues that although Beech Brook health providers noted that KFW had been off medication for several months by June of 2014, "it was not noted that medication helped with unfocused behavior." (ECF Doc. No. 12, Page ID# 443 citing to Tr. 333.) However, plaintiff

---

testimony are not well-taken. However, even if Ford's complaints about Dr. DiTraglia were well-taken the result in this opinion would be unchanged. Because although Ford takes issue with some of Dr. DiTraglia's testimony, Ford does not challenge the opinions of Dr. Tangerman, Dr. Zwissler, and Dr. House. Those three opinions alone could provide substantial evidence for the ALJ's determination.
[6] See also Tr. 237 ("He was started on Ritalin and mother states that his symptoms have greatly improved."); Tr. 250 (When describing KFW's ability to attend to and complete tasks the consultative examiner stated "It appears according to the mother that the psychostimulant is working quite well.")

14

selectively cites Beech Brook records. On the page just prior to the page to which Ford refers, it was expressly noted that KFW had difficulty sustaining attention and on-task behavior "because he was not taking meds for a lengthy period of time." (Tr. 332) Notably, this comment was made before Dr. Caserta switched KFW to the extended-release medication.

In making the determination that KFW's ADHD symptoms improved on medication, the ALJ also cited to Dr. Caserta's March 2014 treatment note that KFW "did very well" when he was on Ritalin but that he ran out the month prior. (Tr. 364) Dr. Caserta provided three months' worth of prescriptions for Ritalin at that time. (Tr. 366) The record does not show a return to Dr. Caserta until eight months later in November 2014. At that time Dr. Caserta changed KFW's prescription to the extended release dose and advised that he return in one month. (Tr. 363) The next month it was recommended that KFW continue the current dosing and follow up in three months, or sooner if problems arose. (Tr. 360) Plaintiff presented no evidence that KFW returned to see Dr. Caserta after the December 2014 visit.[7]

For all of the aforementioned reasons, the ALJ had substantial evidence to support his determination that KFW's ADHD medication improved his ability to concentrate and persist at tasks, and it was proper for the ALJ to consider this evidence in assessing disability. *See Hardaway v. Secretary*, 823 F.2d 922, 927 (6th Cir.1987) (evidence that medical issues can be improved when using prescribed drugs supports denial of disability benefits); 20 C.F.R. § 416.924a(b)(9)(i) (the ALJ may consider the effects of medications on symptoms).

In addition to the medical opinions and KFW's improvements on medication, the

---

[7] Notably, plaintiff did present a school record from early 2015 at the hearing. Thus, it stands to reason that plaintiff would have been aware of the need to bring any records of 2015 visits with Dr. Caserta in order to ensure a complete record.

15

ALJ also placed significant weight on the fact that KFW was able to maintain attention and persist at tasks during his consultative examinations. (Tr. 21) In May 2013, during a physical consultative exam, it was noted that KFW "appeared to have normal attention span for [his] age." (Tr. 21, 238) Similarly, Dr. House stated that KFW was "generally cooperative" and was able to "pay attention and respond to direct questions" during his examination. (Tr. 21, 247, 250) Dr. House noted that although KFW introduced his own comments a few times while he was supposed to be engaged in a task, he returned to the task after getting a response. (Id.) Dr. House also noted that looking at his IQ scores "would not give the sense for his difficulties maintaining attention." (Tr. 247) KFW's psychological exams provide further evidence that he was less than marked in the concentration domain. *See Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 464 (6th Cir. 2014) (the ALJ's finding that medication helped make claimant's ADHD symptoms more manageable, that he could maintain attention when motivated and when working one-on-one, and that he put good effort and complete the psychological testing constituted substantial evidence in support of the ALJ's determination that claimant was less than markedly limited in the attending and completing tasks domain).

Plaintiff also objects to the ALJ's findings because of the following paragraph in the decision:

> Rather, all of the medical sources who have offered opinions in this matter has said that the claimant's impairments have caused a less than marked limitation on this area of functioning [the concentration domain]. (See Exs. 3A, p.4; 5A, p.6; and 5F, p.7; and the testimony of Drs. Silberberg and DiTraglia respectfully given at the claimant's January 21, 2015 and June 11, 2015 hearings.

(Tr. 21) Plaintiff argues that the ALJ failed to perform an adequate review of the record because in this paragraph the ALJ cited to non-existent evidence. (ECF Doc. No. 12, PageID #443-444) Plaintiff points out that the ALJ conducted the hearing on May 21, 2015 (not in January or June)

16

and that no Dr. Silberberg testified. She also notes that there is no page 4 to Exhibit 3A, there is no Exhibit 5A, and Exhibit 5F does not address the topic cited by the ALJ. The Commissioner didn't respond to this argument. She does not contest the introductory statement that all of the medical sources reached the same conclusion on KFW's limitations on the concentration domain.

Plaintiff has identified a problem in the ALJ decision: a lack of careful proofreading and attention to detail. For example, in a separate section discussing KFW's abilities in the domain of acquiring and using information – on which the ALJ had found him to have "less than marked" limitation – the ALJ stated:

> "In describing the claimant's problems in this area as marked as compared to extreme, the undersigned has considered the claimant's academic achievement [citations omitted]. This "less than marked" subfinding is also supported by the fact that the claimant has low average to average intelligence [citations omitted],and that his ability to learn has improved when he has taken his attention deficit hyperactivity medication as prescribed."

(Tr. 20) The overall content of the section from which the above quote is taken makes it obvious that the ALJ was *not* intending to describe the claimant's abilities in this domain as "marked." The quoted language is a mistake. Further, in recounting part of the basis for one of his factual conclusions on the concentration domain, the ALJ cited Exhibit 6F, p. 9, a record that had nothing to do with the matter for which the ALJ cited it. (Tr. 21)

The question that the undersigned must decide is whether the mistake-riddled paragraph about which plaintiff should require the Commissioner's decision to be vacated and the case remanded. I conclude that it does not. Having read dozens of ALJ decisions over the past year, the undersigned has become aware of the fact that ALJ decisions are "team drafted" and, for the sake of consistency, contain much standard verbiage. Mistakes in editing and proofreading will

17

happen. If every mistaken reference to evidence required a remand, the appeals process would grind to a halt.

Rather than making a reflexive decision to remand, the undersigned has critically examined the overall ALJ decision to determine whether the Commissioner's findings are supported by substantial evidence even if the offending paragraph is excised. Making such a further review quickly reveals that the problem is not with the evidence of record, or the ALJ's conclusion concerning that evidence, it is with how well the ALJ has described that evidence. Because the ALJ's primary basis for concluding KFW was not markedly limited in the concentration domain was the concurring opinions of four medical opinion sources, buttressed by the evidence that KFW seemed not markedly limited when being properly medicated, it is not difficult to conclude that the error-filled paragraph, though unfortunate, does not change the conclusion that the ALJ adequately supported his decision. The undersigned concludes that the ALJ amply supported his finding that KFW was less than markedly limited in the concentration domain by relying on the opinions of the medical sources and the absence of any conflicting opinions produced by plaintiff.

When supported by substantial evidence, the ALJ's opinion is not subject to reversal even if there exists substantial evidence in the record to the contrary. *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004) ("As long as substantial evidence supports the Commissioner's decision, we must defer to it, even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal citations and quotations omitted); *Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *see*

18

*also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen v. Bowen*, 800 F.2d 535,545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Thus, even though there are anecdotal teacher reports and Ford's testimony to support a conclusion that KFW had concentration difficulties, and, arguably, could have been classified as markedly limited, the Commissioner's contrary conclusion cannot be reversed because it was supported by substantial evidence: all of the medical expert opinions. Finally, there is no reason to think the medical experts were unaware of the anecdotal evidence to which plaintiff points when they formed their conclusions that KFW was not markedly limited.

I find that the ALJ decision cannot be reversed on the grounds advanced by plaintiff.

## VII. Recommendation

Substantial evidence supports the finding that KFW does not functionally equal a listing because he had a less than markedly impairment in the domain of attending and completing tasks. Thus, the undersigned finds that Ford has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. For these reasons, I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: May 18, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).